325 So.2d 113 (1975)
Arthur L. STEVENSON
v.
STATE of Mississippi.
No. 48569.
Supreme Court of Mississippi.
December 15, 1975.
*114 R. Jess Brown, Jackson, James E. Winfield, Vicksburg, Mark Shenfield, Jackson, Phillip J. Brookins, New York City, for appellant.
A.F. Summer, Atty. Gen. by Karen Gilfoy, Asst. Atty. Gen., Jackson, for appellee.
Before the Court En Banc.
INZER, Justice.
Appellant, Arthur L. Stevenson, about 24 years old, was indicted, tried and convicted in the Circuit Court of Warren County for capital murder pursuant to Section 97-3-19(2)(a), Mississippi Code 1972 Annotated (Supp. 1974), for the killing of A.H. "Holly" Koerper, a deputy sheriff who was acting in his official capacity.
The evidence on behalf of the state established that at about 6 A.M. on July 6, 1974, appellant, while a trusty in the Warren County Jail, killed Holly Koerper, a deputy sheriff, by stabbing him twenty-seven times with a knife. Wilbert Thames, another trusty, testified on the morning in question he washed the dishes and went back to bed. At that time appellant was mopping the floor. Thames went back to sleep and was awakened shortly thereafter by someone hollering and he heard Koerper say, "Arthur. Arthur Lee, please don't kill me." Thames rushed into the hall and saw Koerper on the floor with appellant kneeling over him with a knife in his hand. He said he thought appellant said, "don't nobody slap me." Appellant told Thames if he came any closer he "would get the same thing." Thames then returned to his cell and awakened another trusty. Shortly thereafter appellant returned to the cell and asked Thames and the other trusty if they were going with him and they told him they were not. Appellant then washed his hands and unlocked the cell where Geneva Mitchell was incarcerated and told her to get dressed. Appellant and Geneva then left. Later that day, appellant and Geneva were found in an abandoned building approximately three blocks from the jail.
Sheriff Paul Barrett was informed of the murder, and when he arrived at the jail, he found Koerper lying partially in the kitchen and partially in the dining room. He also found a bloody butcher knife on the dining room table. His investigation revealed that the locked drawer in which the knives were kept had been pried open as had a steel cabinet in which the prisoners' personal belongings were kept. The contents of the cabinet were scattered over the floor and all the money and several other articles were missing.
On July 10, 1974, appellant was indicted by the Grand Jury and on July 15 he was arraigned. On July 22, 1974, he was tried. This trial resulted in a mistrial because the jury failed to agree on a verdict. He was retried on July 31, 1974, and was convicted.
Appellant assigns numerous grounds for the reversal of this case. We will discuss only those assignments which merit discussion.
*115 It is contended that the trial court was in error in overruling his motion to quash the indictment on the ground that the punishment provided in the statute is cruel and inhuman and in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.
Appellant's principal argument with regard to the constitutionality of our capital murder law, Sections 97-3-17 and 97-3-21, Mississippi Code 1972 Annotated (Supp. 1974), is that the Supreme Court of the United States in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), prohibited any arbitrary application of the death penalty upon conviction, and that our statute by merely making mandatory capital punishment in certain enumerated circumstances does not cure the problem of arbitrary application of the death penalty for certain criminals. Appellant points to the discretion which is built into our system of justice; namely, prosecutorial discretion, plea bargaining, jury discretion, appellate review and executive clemency. However, as we understand Furman, the discretion which three of the five justices of the majority found to be constitutionally impermissible was the discretion vested in the judge or jury with regard to the infliction of the penalty and not with regard to the question of guilt; "people live or die, depending on the will of one man or twelve."
Since this is the first case reaching this Court under our capital murder statute, we have not heretofore considered the issue of whether the discretionary aspect of the administration of justice, other than those afforded a judge and jury are constitutionally impermissible, but we find that the Supreme Court of North Carolina considered this argument in State v. Woodson, 287 N.C. 578, 215 S.E.2d 607 (1975). In that case the prosecutor exercised his discretion by determining which of the defendants were permitted to plea bargain and which were tried for a greater offense. Two of the four defendants were allowed to plead guilty to armed robbery while the other two were indicted for first degree murder, the conviction of which required a mandatory death sentence. Appellant alleged that it was "fundamentally unfair" to permit two to plead guilty to less than a capital offense in exchange for their testimony to convict the other two. In rejecting this argument the court quoted from Newman v. United States, 127 U.S.App.D.C. 263, 382 F.2d 479 (1967), as follows:
To say that the United States Attorney must literally plead every offense and every offender alike is to delegate him an impossible task; of course, this concept would negate discretion. Myriad factors can enter into the prosecutor's decision. Two persons may have committed what is precisely the same legal offense but the prosecutor is not compelled by law, duty or tradition to treat them the same as to the charges. On the contrary, he is expected to exercise discretion and common sense to the end that if, for example, one is a young first offender and the other older, with a criminal record, or one played a lesser and the other a dominant role, one the instigator and the other the follower, the prosecutor can and should take such factors into account; no court has any jurisdiction to inquire into or review his decision (Woodson, supra, at 618).
That Court further stated:
Mere selectivity in prosecution creates no constitutional problems. Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962). To invoke the defense [denial of equal protection under the Fourteenth Amendment] one must prove that the selection was deliberately based on an unjustifiable standard, such as race, religion, or other arbitrary classification. United States v. Steele, 461 F.2d 1148, 1151 (9th Cir.1972).
(Id. at 618).
It is obvious to us that the discretion of a prosecutor and his power to plea bargain *116 is constitutionally permissible. If such discretion were impermissible with regard to prosecution for a capital offense, then it would be impermissible with regard to a prosecution for any crime. Without prosecutorial discretion and plea bargaining, our system of justice could not function. Jury discretion, appellate review, and executive clemency have always been checks built into our system.
Citing society's repudiation of the death penalty, world-wide trends toward the abolition of the penalty, frequent jury nullifications, and the lack of useful purpose, appellant contends that the imposition of the penalty pursuant to the statute would constitute cruel and unusual punishment in violation of the Eighth Amendment of the United States. This view was the one espoused by two of the justices in their concurring opinion in Furman. However, only these two justices were prepared to hold that capital punishment per se was unconstitutional; two other justices specifically reserved the question and limited their decision to hold that only the arbitrary infliction of the death penalty constituted cruel and unusual punishment. Consequently, under the decision in Furman, a mandatory death penalty statute is constitutional, when, as in this case, no showing was made that it was discriminatorily applied. Especially is this true in the light of Section 99-17-20, which prohibits the judge from instructing the jury on any lesser included offenses. Appellant in this case requested the instructions on lesser included offenses and the court properly refused to grant such instructions. Under this statute the jury has the option either to convict or to acquit the defendant and nothing more.
We thoroughly considered the question of the constitutionality of the death penalty in Peterson v. State, 268 So.2d 335 (Miss. 1973), wherein we stated:
The personal views of the several Judges of this Court on the question of the death penalty in general, or on its application in a particular case, should not affect its constitutionality. Along with every thoughtful person we stand in awe before the judgment of death, painfully aware of human frailty, including our own, and the finality of death. But we are aware that difficult decisions must be made. Punishment has been a part of the history of the human race, and we cannot say at this particular moment in time that the shadow of the death penalty does not deter, or that it does not have a proper and constitutional part in dealing with the age-old and ever-increasing problem of crime.
(268 So.2d at 338).
We find that nothing has transpired since this decision to cause us to change our views with regard to the infliction of the death penalty. In fact, events that have transpired in the past three years cause us to be more thoroughly convinced that the death penalty does have a proper and constitutional part in dealing with the increasing problem of crime.
Appellant contends that the failure of the trial court to appoint a psychiatrist to examine appellant where there was reasonable probability that appellant was not mentally competent to stand trial, deprives appellant of his right to a fair trial and due process of law.
Counsel for appellant filed a sworn motion asking the court to commit appellant to the Mississippi State Hospital for examination to determine the question of appellant's sanity and his ability to make a rational defense of the charge pending against him. As a basis for the motion, the attorneys stated that in their opinion appellant was insane, and because of his insanity, he was not able to make a rational defense. The motion was made pursuant to Section 99-13-11, Mississippi Code 1972 Annotated, which authorizes the circuit court in any criminal action in which the mental condition of the person indicted *117 for a felony is questioned to order a mental examination by a psychiatrist selected by the court to determine his ability to make a defense.
In support of the motion, four witnesses testified on behalf of the appellant. His mother testified that in her opinion the appellant was not sane. She said he had never acted like a normal person; in 1959 he was hit in the head by a bat, and since that time his behavior had become "funnier." She further testified that since the incident with the bat, he had been in and out of trouble, that he had been in the penitentiary on two occasions, and that the last time he was released he came home on Saturday and was back in jail on another charge on Monday. She had seen him on three occasions since he had been in jail and to her he seemed to be "off" and would hardly talk to her. She said on one occasion he did not act like he recognized her, and that on another occasion, he did talk to her.
The next two witnesses had not had an opportunity to observe the appellant in the last three or four years, but they gave a history of his unusual behavior prior to that time. In their opinion he was not sane.
Dr. Otrie Hickerson Smith, a qualified and experienced psychiatrist, testified that she examined appellant on July 14, 1974, the day before the hearing on the motion, for a period of about forty minutes. She testified that based on her examination it was her opinion that appellant was mentally incapable of making a rational defense to the charges against him. Due to her limited examination she was unable to determine whether appellant was suffering from a psychosis or neurosis, but advised further examination. She concluded on the basis of her examination that appellant should not be required to stand trial without further psychiatric examination.
In rebuttal the state called four witnesses all of whom were law enforcement officers who testified that they saw no difference in appellant's mental condition since the homicide, and in their opinion he was not insane and was able to confer with his attorneys about the facts in the case.
The trial court was of the opinion that the movant failed to meet his burden of proof and that the testimony did not reveal any inadequacy of the defendant to present his defense. We cannot ascertain from the opinion of the trial court whether the court considered the question of whether the testimony raised a reasonable probability that the defendant was incapable of making a rational defense. We pointed out in McGinnis v. State, 241 Miss. 883, 133 So.2d 399 (1961), that although the provisions of Chapter 262, Laws of 1960, now Section 99-13-11, Mississippi Code 1972 Annotated, did not mandatorily require that the trial court order a psychiatric examination of an accused when his present ability to conduct a rational defense is in question, the salutary purpose of the statute is to avoid the trial of a defendant for a crime in this state unless he is at the time capable of conducting a rational defense by intelligently conferring with counsel as to the facts in connection with the crime. We have held in a number of cases that if the showing before the trial court is sufficient to engender a reasonable probability that the defendant is incapable of making a rational defense, then a psychiatrist should be appointed to make the examination or that the defendant should be sent to the Mississippi State Hospital at Whitfield for examination and evaluation. Robinson v. State, 223 Miss. 70, 77 So.2d 265 (1955).
We have carefully examined the evidence on this issue and have reached the conclusion that it was sufficiently raised and there was a reasonable probability that the defendant was incapable of making a rational defense and the trial court was in error in failing to sustain the motion. Therefore, this case must be reversed and remanded in order that this issue *118 may be definitely determined prior to another trial.
Although this case must be reversed on the issue above, other issues were raised that should be decided prior to another trial.
Appellant contends that the trial court was in error in overruling his motion for a change of venue because of widespread prejudicial pre-trial publicity. The state presented six witnesses who testified in essence that in their opinion the appellant could get a fair trial in Warren County. Appellant presented an equal number of witnesses who testified because of the widespread publicity by the news media and because the person killed was a popular law enforcement officer, the appellant could not get a fair trial in Warren County. We do not deem it necessary to detail the testimony in this regard. It is sufficient to say that at the time the motion was made it was properly overruled. However, after a thorough study of the entire record in this case, we find the facts and circumstances such that we are of the opinion that the trial court should have sustained appellant's motion for a new trial and changed the venue to another county. We pointed out in Peterson v. State, 242 So.2d 420 (Miss. 1970), that in passing upon an application for a change of venue, the court looks to the completed trial and if it appears that the case has been prejudged or that conditions existed which prevented the defendant from securing a fair and impartial trial, then the court should sustain the motion even though it appears upon a motion for a new trial. We are convinced from the entire record in this case that this case should not have been tried in Warren County and we direct that the venue be changed to another county.
Appellant also contends that he was denied a fair trial because the trial court refused to excuse two of the veniremen for cause; applied unconstitutional standards in excusing veniremen because of their views regarding capital punishment; and systematically excluded veniremen with conscientious scruples against capital punishment which denied him his Sixth Amendment right to a representative jury.
After a review of the record we find that the trial court was in error in refusing to excuse two veniremen for cause, but since this error is not likely to occur in another trial, we will not pursue it other than to reiterate what this Court said in Klyce v. State, 79 Miss. 652, 31 So. 339 (1902):
It would nullify the constitutional provision, and seriously endanger the fairness of trials, to hold a juror who had an opinion competent merely because he says he could try the case impartially. When they say so and they think so, it is for the court to say whether in fact he can view in the light of the weakness of human nature.
(31 So. at 340).
We also find that the trial court did excuse two veniremen after they stated that they did not believe in capital punishment without questioning them to discover whether they could still follow the law and convict the defendant if the evidence so warranted. In Myers v. State, 254 So.2d 891 (Miss. 1971), we stated the rule in this regard as follows:
The proper method of bringing the death penalty to the attention of the special veniremen is for the trial judge to inform them that they have been summoned as veniremen in a capital case and that a verdict of guilty could result in the infliction of a death penalty. The judge should then ask them if any member of the panel has any conscientious scruples against the infliction of the death penalty, when the law authorizes it, in proper cases, and where the testimony warrants it. If there are those who say they are opposed to the death penalty, the trial *119 judge should then go further and ask those veniremen, who have answered in the affirmative, whether or not they could, nevertheless, follow the testimony and the instructions of the court and return a verdict of guilty, although that verdict could result in the death penalty, if they, being the judges of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict. Those who say they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released.
(254 So.2d at 893, 894).
This rule is still in effect, but of course, where as in this case, the conviction carries a mandatory death penalty, it is proper for the trial judge to so inform the veniremen.
We find no merit in appellant's argument that the exclusion of veniremen with conscientious scruples violated his Sixth Amendment right to a representative jury. Citing Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), appellant contends that since the court held that a jury must be drawn from a representative cross section of the community, he was denied his constitutional right to a representative jury because a cross section necessarily includes those who do not believe in capital punishment. It is obvious that it would be futile for the state to try an accused charged with an offense that carries a mandatory death penalty by a jury composed of one or more jurors who have religious or conscientious scruples against the infliction of the death penalty under any circumstances, and who would not follow the evidence and instructions of the court, and return a verdict of guilty even though they were convinced beyond a reasonable doubt of the guilt of the defendant. Such persons are not competent jurors in a capital case and the court should exclude such persons.
Appellant also contends that the trial court erred in allowing the introduction into evidence of two photographs of the deceased because they were without probative value and merely inflamed the jury. The two photographs in question were taken at the funeral home after the body had been washed, and were introduced in addition to two photographs taken at the scene of the crime, the introduction of which is not complained of on appeal. The state contends that the photographs in question had probative value because as indicated by the testimony the number of wounds was impossible to determine until the body had been washed. While we would not reverse this case on this ground alone, a review of the record convinces us that these two photographs had no probative value and on retrial should not be admitted in evidence. It is obvious from the pictures that they were not introduced to show the number of wounds inflicted because the body was posed in such a manner to unduly emphasize the most serious wounds.
After a careful review of the record and briefs by the Court en banc, for the reasons stated, this cause must be and is reversed and remanded for another trial.
Reversed and remanded.
All Justices concur.